# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| **MYRA RAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-09-BE-0238-M** |
| | ) | |
| **SUN LIFE & HEALTH INS. CO.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This ERISA case comes before the court on Plaintiff's "Objection to Declaration of Kathleen Peters and Motion to Strike Affidavit" (doc. 36); Plaintiff's "Motion to Supplement the Record or, in the alternative, Motion to Remand" (doc. 20) (attaching documents as supplements to the Record); Plaintiff's "Motion for Partial Summary Judgment on Issues of which Policy is Applicable, What Benefit Rate is Applicable and Whether Discretionary Authority has been Granted to Sun Life" (doc. 21) (with attached exhibits); "Sun Life and Health Insurance Company's Motion for Summary Judgment" (doc. 23); and "Plaintiff's Motion for Partial Judgment on the Record on Count I, or in the Alternative, Motion for Summary Judgment with Discovery Submitted in Support Thereof" (doc. 27) (with attached exhibits). These motions, in this case brought pursuant to 29 U.S.C. § 1132 for ERISA benefits and for related claims, have been thoroughly briefed.  For the reasons stated in this Memorandum Opinion, the court finds that Plaintiff's Motion to Strike is due to be DENIED; Plaintiff's Motion for Partial Summary

Judgment on the remaining issue regarding the existence of discretionary authority is due to be DENIED; Plaintiff's Motion to Supplement the Record is due to be DENIED and the alternative Motion to Remand is due to be DENIED; Plaintiff's Motion for Judgment on the Record is due to be DENIED and her alternative Motion for Summary Judgment is due to be DENIED; Defendant's cross motion, which the parties agreed to be a submission on the merits, is due to be GRANTED as to all counts in the Complaint but DENIED without prejudice as to the Counterclaim.

## I.  PLAINTIFF'S MOTION TO STRIKE AFFIDAVIT

In its motion (Doc. 36), Plaintiff requests that the court strike the declaration of Kathleen Peters (Doc. 25-1), because Ms. Peters implies in that declaration that Genworth Life and Health Insurance Company became Sun Life & Health Insurance Company, and Plaintiff asserts that this implication is false.  However, Defendant has produced evidence to support Ms. Peters's statement or implication that Genworth Life and Health Insurance Company legally changed its name to Sun Life and Health Insurance Company[1].  Accordingly the court DENIES Plaintiff's motion to strike.

## II.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ISSUES OF WHICH POLICY IS APPLICABLE, WHAT BENEFIT RATE IS APPLICABLE AND WHETHER THE DISCRETIONARY AUTHORITY HAS BEEN GRANTED TO SUN LIFE

### A.  The Applicable Policy

In her reply (Doc. 35) to the Defendant's motion for partial summary judgment (Doc. 21),

---

[1]The Alabama Department of Insurance documents and the Alabama Secretary of State's website printout reflect that the Defendant has legally changed its name from GE Group Life Assurance Company to Phoenix Life Insurance Company to Genworth Life and Health Insurance Company and, ultimately, to Sun Life and Health Insurance Company.  *See* Docs. 25-5 & 25-6.

Plaintiff withdrew her motion to the extent that it requests rulings on the issue of which policy and which benefit rate applies; she acknowledges that Defendant presents the correct policy as in force and effect at the time of the claims decision in question and that the applicable benefit rate is 60% of salary.  Accordingly, those portions of Plaintiff's motion (Doc. 21) are MOOT as withdrawn.

### B.  The Authority Accorded to Sun Life

The remaining issue in Plaintiff's motion for partial summary judgment is whether the applicable policy accords discretionary authority to Sun Life to carry out claims decisions. Plaintiff's argument disputing Sun Life's discretionary authority is twofold: (1) she asserts that an insurance company cannot retain discretionary authority, and GE Group Life Assurance Company's attempt to do so in this case was invalid; and (2) she asserts that when a change occurs in the insurance company acting as claims fiduciary, the grant of discretionary authority to the original company - here, GE Group Life Assurance Company, does not transfer to the new company, Sun Life.

The policy, an ERISA plan document, contains the following provisions regarding the authority of the claims fiduciary:

**CLAIMS FIDUCIARY:**
GE Group Life Assurance Company is a fiduciary, as that term is used in ERISA and the regulations which interpret ERISA, with respect to insurance policies under which you, and if applicable, your dependents are insured.  In this capacity, we are charged with the obligation, and possess discretionary authority to make claim, eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language.

GE Group Life Assurance Company, as Claims Fiduciary, shall have the sole and exclusive discretion and authority to carry out all actions involving claims

procedures explained in the Policy.  The Claims Fiduciary shall have the sole
and exclusive discretion and power to grant and/or deny any and all claims for
benefits, and construe any and all issues relating to eligibility for benefits.  All
findings, decisions, and/or determinations of any type made by the Claims
Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an
arbitrary and/or capricious manner.  Subject to the requirements of law, the
Claims Fiduciary shall be the sole judge of the standard of proof required in any
claims for benefits and/or in any question of eligibility for benefits.  All
decisions of the Claims Fiduciary shall be final and binding on all parties.
Whenever a decision on the claim is involved, the Claims Fiduciary is given
broad discretionary powers, and the Claims Fiduciary shall exercise said powers
in a uniform and nondiscriminatory manner in accordance with the Plan's terms.
Our authority is limited to such insurance policies and we are not a fiduciary of
any other aspect of the Plan, insured or otherwise.  We are not the Plan
Administrator (as that term is understood under ERISA) and we are not
responsible for any assert or property which belongs to the Plan.

(Def.'s Evid. Sub., Doc. 25-4, at 148).  The court agrees with Defendant that this language,

which is part of the plan, expressly confers discretionary authority upon GE Group Life

Assurance Company, and concomitantly, disagrees with Plaintiff that these provisions represent

an improper or ineffective retention of discretionary authority.

As to Plaintiff's second argument, the court agrees with Defendant that GE Group Life

Assurance Company's legal changes to its name would not destroy or otherwise alter the grant of

discretionary authority to the Defendant entity.  The only case that Plaintiff cites in support of its

argument, *McKeehan v. CIGNA Life Insurance Company*, is inapposite.  344 F.3d 789 (8th Cir.

2003).  In that case, a plan sponsor first hired a third party insurance company to perform

ministerial claims processing functions that did not involve wielding discretionary authority on

claims.  Before a final claims decision occurred on plaintiff's claim, the sponsor underwent a

change in ownership.  The new owner/sponsor replaced the original insurance company with a

different company and gave the new insurance company broader *function* in the processing of

4

claims.  However, the Plan itself did not change and contained no explicit discretion-granting language.  Because the new owner/sponsor and new insurance company could produce no agreement in the Plan constituting an express delegation of discretionary authority to the new insurance company,  the court found that the new insurance company did not have express discretionary authority to trigger a deferential standard of review.  Thus, the court reviewed the denial of benefits under a *de novo* standard of review. *Id.* at 793.

The instant case involves distinguishable facts, because in this case, the Plan expressly confers discretionary authority, and the insurance company upon which the plan conferred discretionary authority is the same entity as the company making the benefits decision; the entity did not change, but the entity simply changed its name.  Defendant has provided evidence establishing that it has undergone a series of legal name changes from GE Group Life Assurance Company to the current name of Sun Life and Health Insurance Company.  *See* Def.'s Evid. Sub., Doc. 25-5 & 25-6.  Throughout the name changes, the rights and obligations, including the grant of discretionary authority in the instant policy, remained with the Defendant entity, which is now known as Defendant Sun Life.  Plaintiff does not dispute that evidence regarding name changes. The legal name change does not destroy or otherwise alter the grant of discretionary authority to Sun Life.

Therefore, the court finds that the ERISA plan at issue expressly confers discretionary authority to the Defendant, now known as Sun Life, and further, that the Plaintiff's motion for partial summary judgment (Doc. 21) is due to be DENIED as to that remaining issue.

5

### III.  PLAINTIFF'S MOTION TO SUPPLEMENT THE RECORD, OR IN THE ALTERNATIVE, MOTION TO REMAND

Plaintiff requests this court's permission to supplement the Record with the following documents:  the statement of Dr. Bourge dated 8/20/09 and medical records dated 10/22/08, 3/11/09, and 6/17/09 -  Exhibit A (Doc. 20-2, at 1-9); and Plaintiff's affidavit dated 9/2/09 - Exhibit B (Doc. 20-2, at 10-11).  Alternatively, Plaintiff requests that this court remand the case, ordering Defendant Sun Life to consider those records.  The attachments to the motion reflect that Plaintiff's counsel sent these medical records and Dr. Bourge's statement to the Defendant on August 26, 2009, *after* the administrative rulings and over six months *after* the instant suit was filed.  The motion does not reflect whether Exhibit B, which is Plaintiff's affidavit, was provided to Defendant before the motion's filing, but it appears to be dated September 2, 2009, and if that date is correct, it postdated the administrative rulings.

Defendant objects to the proposed supplementation of the Record, arguing that the standard of review in this case should be a deferential arbitrary and capricious standard.  Because a review based on that standard requires that the Record remain as the it existed at the time of the decision on the request for benefits, Defendant insists that supplementation is inappropriate.

To resolve Plaintiff's request, the court must first determine which type of review is appropriate in this case: *de novo* as Plaintiff asserts, or arbitrary and capricious as Defendant contends.  If the arbitrary and capricious standard applies, then the Record must not be supplemented, because "the function of the court is to determine whether there was a reasonable basis for the [claims] decision, *based upon the facts as known to the administrator at the time the decision was made*." *Glazer v. Reliance Standard Life Ins. Co.,* 524 F.3d 1241, 1246 (11th Cir.

2008) (emphasis added) (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).  The appropriate standard of review depends, in turn, upon whether the ERISA plan at issue affords discretion to the plan fiduciary; if the plan affords such discretion, then the deferential arbitrary and capricious standard applies.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Doyle v. Liberty Life Assurance Co.,* 542 F.3d 1352, 1355 (11th Cir. 2008).

The court previously quoted the Plan language granting to the Claims Fiduciary "discretionary authority to make claim, eligibility, and other administrative determinations regarding these policies, and to interpret the meaning of their terms and language."  (Doc. 25-4 at 148).  Still other language states that the Claims Fiduciary has "sole and exclusive discretion" and states that its decisions "shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and/or capricious manner."  *Id.*  In light of the court's finding that the ERISA policy at issue expressly confers discretionary authority upon the Claims Fiduciary, Sun Life, the court further finds that the arbitrary and capricious standard applies and that the motion to supplement the Record (Doc. 20) is due to be DENIED.

Alternatively, Plaintiff requests that this court remand the case to consider the additional documents, suggesting that the plan's duty to consider new evidence continues even after administrative rulings have occurred, the administrative appeals process has concluded, and litigation has commenced.  This court does not agree with Plaintiff's position.  Indeed, if the plan had such a duty, the process of deciding each claim for benefits under ERISA could continue *ad infinitum*, or as long as the plaintiff continued to have doctor or hospital visits and chose to submit additional documents for consideration.

Plaintiff cites several cases that she claims support her position, including *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001). However, that case affirmed the district court's *refusal* to remand. In *Levinson*, the Eleventh Circuit addressed the plan administrator's argument that the case should be remanded to it to consider new evidence, such as an independent medical opinion obtained for its summary judgment motion. The Court of Appeals cited with approval an Eighth Circuit case, *Davidson v. Prudential Ins. Co. of Am.*, 245 F.3d 1321, 1328 (8th Cir. 1992), and specifically found persuasive the *Davidson* district court's reasoning for refusing to remand that case: "if [the plaintiff] believed the evidence he now offers was necessary for the [defendant plan administrator] to make a proper benefits determination, [plaintiff] should have obtained this evidence and submitted it to the [plan administrator]." *Levinson*, 245 F.3d at 1328 (quoting *Davidson*, 953 F.2d at 1095). Although the party requesting remand in *Levinson* was the plan administrator, the Eleventh Circuit stated that the quoted reasoning should apply "with equal force" to either party. Noting that the party requesting remand waited until after the litigation commenced before obtaining the additional information that it desired to be addressed on remand, the Eleventh Circuit determined that the district court's refusal to remand should be upheld. *Id.*

This court does not read the *Levinson* case as supporting Plaintiff's motion for remand. In fact, the Eleventh Circuit's reasoning in *Davidson* supports this court's denial of the motion to remand.

Similarly, the court does not find support for Plaintiff's position on remand in the other Eleventh Circuit decisions that Plaintiff cites. In *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997), the Eleventh Circuit affirmed the district court's remanding the case to the

plan administrator because its denial of claims benefits was arbitrary and capricious, and –
given that the administrator would be making a second and more comprehensive evaluation of
the matter on remand – directed the plan administrator also to consider subsequently available
evidence. The court does not read that case as requiring remand to review post-denial evidence
in the absence of a finding first that the plan administrator acted arbitrarily and capriciously in
denying the claim. In another case Plaintiff cited, *Torres v. Pittston Co.*, 346 F.3d 1325,1334-35
(11th Cir. 2003), the Eleventh Circuit specifically refused to express an opinion on the remand
issue and thus, that decision provides no support.

The court does not read *Jett v. Blue Cross Blue Shield*, 890 F.2d 1137, 1140 (11th Cir.
1989) or any Eleventh Circuit case as *requiring* a district court to remand solely for consideration
of new evidence, such as medical records, and Plaintiff's affidavit dated *after* the claims
fiduciary's denial of the claim. This court, in its discretion, finds that Plaintiff's alternative
motion to remand (Doc. 20) is due to be DENIED.

## IV.  CROSS-MOTIONS FOR JUDGMENT ON THE RECORD/SUMMARY JUDGMENT

The remaining motions are "Plaintiff's Motion for Partial Judgment on the Record on
Count I, or in the Alternative, Motion for Summary Judgment with Discovery Submitted in
Support Thereof" (Doc. 27); and "Sun Life and Health Insurance Company's Motion for
Summary Judgment" (Doc. 23). As the docket reflects, during a phone conference call with the
court on March 5, 2010, counsel for both parties agreed to submission of this case on the merits
based on the Record; accordingly, regardless of the title of these motions, they are submitted to
the court for adjudication on the merits.

### A.  Procedural History

The instant suit represents an appeal of Sun Life's decision to discontinue long-term disability benefits after the exhaustion of remedies on the administrative level.  In addition to the procedural history discussed above relating to the standard of review and supplementation of the Record, the court also notes that Plaintiff has filed three complaints in this case: the original Complaint filed in the state court of Etowah County, Alabama and removed to this court; a timely-filed Amended Complaint; and the Second Amended Complaint.  Because Plaintiff withdrew the Second Amended Complaint, the Amended Complaint (Doc. 5) is currently in effect.  That Complaint contains two counts: Count I, asserting Plaintiff's entitlement to long-term disability benefits filed pursuant to ERISA; and Count II, also filed pursuant to ERISA, asserting, because of her disabled status, Plaintiff's entitlement to a waiver of premium on a life insurance contract with Sun Life through her employment.

Sun Life also filed a counterclaim (Doc. 6), asserting that it had overpaid Ray to the extent of her receipt of Social Security Disability benefits for the period of time Ray received disability benefits under the plan.  Sun Life asserts its entitlement to the appropriate equitable relief in light of its entitlement pursuant to Plan provisions to be reimbursed for the overpayment as well as attorney fees.

### B.  FACTS

Plaintiff, Myra Ray, was employed by Tape Craft Corporation as Vice-President of Manufacturing before claiming disability under an employee welfare benefit plan insured by Defendant, Sun Life.  Her job description's physical demands section states that "the employee is regularly required to sit; use hands to finger, handle, or feel; reach with hands and arms and talk

or hear.  The employee is occasionally required to stand and walk.  The employee must

occasionally lift and/or move up to 10 pounds."  (AR 82, doc. 25-1, at 87).  The job description

also states the specific vision requirements and provides that the company may make reasonable

accommodations to enable individuals with disabilities to perform the essential work tasks.

Ray's job also includes, among other things, directing and coordinating of  activities of the

departments of manufacturing; traveling by car and air; working closely with people; and being

available on a 24-hour basis for problem phone calls.  Ray's policy defines total disability as

follows: "Total Disability must be caused by Sickness or Injury and must commence while you

are insured under the policy.  You will be considered Totally Disabled if you are unable to

perform all the material and substantial duties of your regular occupation."  (AR 106, Doc. 25-1,

at 112).   The policy does not define "regular occupation."

  At some point, Ray developed arrhythmia or atrial fibrillation, and began receiving

treatments for her heart condition at the University of Alabama at Birmingham on April 9, 2005.

Ray claimed disability on or about September 20, 2005.  In support of her claim for long-term

disability benefits, Ray submitted the Attending Physician's Statement from Dr. Robert Bourge,

her treating cardiologist, in which Dr. Bourge stated that he had treated her for "Pulmonary

Hypertension - A-Fib" and he described her condition as "Class 4 (Complete limitation)."  (AR

520; Doc. 25-4, at 76).  Under the heading of "psychiatric impairment," Dr. Bourge marked

"Class 3 - Patient is able to engage in only limited stress situations and engage in only limited

interpersonal relations (moderate limitations)." *Id.*  Dr. Bourge's statement was not dated, but it

listed the date of her last visit as August 17, 2005, and it was submitted in connection with her

claim for benefits, filed on September 20, 2005.

11

On February 1, 2006, after Ray submitted her claim for long-term disability benefits but before Sun Life initially approved the claim, Dr. Bourge saw Ray in his office.  His office notes for that date state:

> [Ray] continues to do well walking 20 minutes 3-4 times weekly on her treadmill.  She denies dyspnea [shortness of breath] with climbing her stairs at home.  Additionally, she denies orthopnea [form of dyspnea that allows comfortable breathing only when standing or sitting erect], PND [breathing disorder related to congestive heart failure], lower extremity edema, or chest pain.  She has not had any syncope [fainting] or pre-syncopal symptoms.  She does note that she is aware of her heart beat since being off the amiodarone [medication used to treat heart arrhythmia].  She attributes this to the fact that her resting heart rate is slightly faster than it had been.

(AR 245; Doc. 25-2, at 101).  On this date, under "Impression," Dr. Bourge classified Ray as "NYHA class 1." (AR 246, Doc. 25-2).  The American Heart Association's website states that the most commonly used classification system for heart failure is the New York Heart Association Functional Classification, based on how a patient feels during physical activity; it describes NYHA Class I as "No symptoms and no limitation in ordinary physical activity." Above his signature, Dr. Bourge stated: "I personally interviewed and examined this patient during this visit with the cardiovascular associate noted above and confirmed all of the information noted.  The impression and plan above was dictated or typed by me and was directed by my personal evaluation of this patient."  (AR 246, Doc. 25-2, at 99).

Sun Life requested and received an independent medical report from Dr. Alan Carr dated March 22, 2006.  Dr. Carr acknowledged an improvement in Ray's condition, the lack of recent documented symptoms of heart failure, and cardiology office visit notes categorizing her heart failure as NYHA class IIIB, II, and I.  However, he stated that "[d]espite the documented improvement in the claimant's NYHA classification, it is my opinion that at this time the

claimant continues to have a level of impairment that precludes her from performing her own occupation.  This is due to the fact that it is unclear how stable her cardiac condition is at this time." (AR 475, Doc. 25-4, at 21).  He recommended follow-up with subsequent office visit notes to further evaluate the stability of her condition.

Sun Life[2] initially approved Ray's claim for long-term disability benefits, notifying her in a letter dated March 23, 2006 that she would continue to receive benefits "as long as [she] remained Disabled as defined." and that Sun Life would "be requesting periodic updated medical information" regarding her disability status.  (AR 470; Doc. 25-4, at 26).

On May 4, 2006, Dr. Bourge completed an Attending Physician's Supplemental Statement that stated a diagnosis of pulmonary hypertension and right ventricular dysfunction, and lists her Cardiac Functional Capacity as Class 3 (Marked limitation), with Class 1 (No limitation) marked and then marked out.  He stated the longest single time duration for Ray to perform the following activities:  sitting - 4 hours; total time on feet - 1 hour; standing - .5 hour; walking - .5 hour; and bending, squatting, stooping, kneeling, reaching - 0 hours.

On May 5, 2006, the next day, Ray returned to Dr. Bourge's office, and the office notes, signed by Dr. Bourge, stated that Ray "denied[d] any chest pain, shortness of breath, increased dyspnea on exertion, orthopnea, PND, edema, dizziness, or syncope."  (AR 247, Doc. 25-2).  Dr. Bourge confirmed that the "pulmonary hypertension [was] improved by symptoms" and described her heart rate as "controlled" and "NYHA Class has improved to Class II."  (AR 246-47, Doc. 25-2).   The American Heart Association website describes  NYHA Class II as "Mild symptoms and slight limitation during ordinary activity.  Comfortable at rest." *Classes of Heart*

[2]At this time, Sun Life was known as Genworth Financial.

*Failure,* http://www.heartorg.

On August 2, 2006, Ray returned to see Dr. Bourge and denied the same symptoms that she denied in her last two visits, except that the doctor did not refer to edema.  In the "Impression" section of his signed report, however, Dr. Bourge characterized her pulmonary hypertension as "improved" and stated that Ray "still remains NYHA functional Class III," even though he had classified her as Class I or Class II in his last two reports.  (AR 250, Doc. 25-2).  He stated that Ray's permanent atrial fibrillation was "rate controlled."  *Id.*  The American Heart Association describes Class III symptoms as "Marked limitation in activity due to symptoms, even during less-than-ordinary activity.  Comfortable only at rest."  *Classes of Heart Failure,* http://www.heartorg.

On November 1, 2006, Ray returned to Dr. Bourge's office.  An unsigned office note states "[Ray] has been doing well and denies any new complaints.  Since her last clinic appointment she was seen by Dr. Kay in October, 2006, who felt hat she was not well rate controlled and changed her Metoprolol to Nadolol.  She was advised not to work by Dr. Bourge, and currently does some light work around the house.  She says that she does get some dyspnea on exertion, especially on inclines, but her functional status has been more or less stable.  She denies any chest pain, orthopnea, PND, edema, dizziness or syncope."  (AR 427, Doc.  25-3, at 133).  A few weeks later, on November 16, 2006, Dr. Bourge completed another Attending Physician's Supplemental Statement, listing Ray's cardiac functional capacity as Class 3 and her psychiatric impairment as Class 3.

On April 16, 2007, Ray saw Dr. G. Neal Kay at the Kirklin Cardiology Clinic.  His office notes state that Ray was "doing well" and called for her to return in one year for a routine follow-

up.  (AR 317, Doc. 25-3, at 23).

Unsigned chart notes dated June 13, 2007 indicate that Dr. Bourge and his associate saw Ray and stated: "She has been doing about the same since last visit with no shortness of breath at rest or with [activities of daily life].  She is quite active around her house but has not been doing any scheduled exercise due to her atrial fibrillation.  When she starts walking she has an elevated heart rate and it is uncomfortable and she is questioning whether she should continue walking. She denies chest pain, lower extremity edema, dizziness, or PND."  Dr. Bourge listed "NYHA class II symptoms" under "Impression."  (AR 396, Doc. 25-3, at 102).

On July 8, 2007, Sun Life asked Ray to complete a Supplemental Claim Statement to evaluate her continued eligibility.  On this signed statement, also dated July 8, 2007, Ray states: "symptoms present with only a small amount of exertion are shortness of breath, extreme fatigue, chest pain, dizziness, panic" and claimed to "only drive within [her] area."  (AR 402-03, Doc. 25-3, at 108-09).

Sun Life also requested an updated Physician's Statement from Dr. Bourge, which he completed on August 9, 2007.  Dr. Bourge listed Ray's diagnosis as pulmonary arterial hypertension right ventricular with subjective symptoms as "shortness of breath; edema, fatigue, dizziness, and occasional palpitations."  With respect to her heart functional capacity, he checked "Class 3 (Marked limitation) with the following functional limitations (longest single time duration each activity can be performed): 1 hour sitting, 1 hour total time on feet with 0.25 standing and 0.25 walking.  In describing how the patient's symptoms affect her ability to work, Dr. Bourge replied: "Severe pulmonary hypertension; poor prognosis; our goal is to improve her current quality o f life and increase her chances of survival."  (AR 394, Doc. 25-3, at 100).

On September 5, 2007, Ray returned to Dr. Bourge for a follow-up visit.  The signed progress note from that visit states that Ray "has been feeling well.  She performs her activities of daily living without any problems.  She denies heart failure symptoms."  Under "Impressions," Dr. Bourge lists her heart function as "Class II-III, stable."  (AR 257-58, Doc. 25-2).

On January 30, 2008, Dr. Bourge saw Ray once again.  In the signed chart notes, he records her subjective symptoms as follows: "She states her symptoms have been stable with her baseline shortness of breath and dyspnea on exertion along with two-pillow orthopnea.  She denies chest pain, palpitations, worsening edema, dizziness, or syncope."  He listed his impressions as "1.  Pulmonary hypertension.  Stable NYHA Class IIb to Class III symptoms.  2. Blood pressure.  Blood pressure has improved since starting the Zestril.  3.  Atrial fibrillation, which is rate controlled and patient is on Coumadin for anti-coagulation."  (AR 260, Doc. 25-2).

Subsequently, Sun Life retained an investigator to conduct surveillance on Ray over several days.  On March 29, 2008, the investigator observed Ray and her family leaving home at 8:34 a.m., with her husband driving, and returning seven-and-a-half hours later, shortly after 3:00 p.m.  During the interim period, Ray and her family went to a restaurant, an AT&T store, a convenience store, a department store, a clothing store, a bake shop, and to an area of several adjacent car dealerships.  They spent two hours car shopping, looking at four different makes of cars, and took a test drive.  The investigator reported this information to Sun Life in a report dated April 1, 2008.  (AR 306-310, Doc. 25-2).  A month later, on April 29, 2008, the investigator documented Ray driving three separate destinations in one day: dropping a child off at school and returning home; driving back and forth to the bank; and driving to and from an attorney's office, where she remained for approximately one hour.  The investigator reported this

16

activity to Sun Life in a report dated May 1, 2008.  (AR 323-27, Doc. 25-2).

Sun Life also obtained from Dr. Mark Eaton, who is a board-certified internist sub-specializing in cardiovascular disease, an independent, non-examining review of Ray's medical records and the surveillance documents.  The form listed Ray's job title as VP Manufacturing and characterized it as sedentary.  Dr. Eaton's Peer Review Report is dated May 21, 2008. Noting specifically Ray's activity under surveillance as well as the September 5, 2007 Kirklin Clinic note in which Ray denied heart failure symptoms and acknowledged performing activities of daily living without problems, Dr. Eaton opined that Ray is able to return to work at her own occupation without any reduction in her ability to work full time.  He also opined that Ray "would be capable of working full-time at a sedentary or light duty occupation," with no functional limits "at a sedentary work level from a cardiovascular standpoint."  He found that Ray had "no restrictions to sitting and can walk or stand for up to 6 hours in an 8 hour day."  Dr. Eaton further found that Ray's "reported symptoms of extreme fatigue, shortness of breath, dizziness and chest pain are not supported by the medical records reviewed nor are they supported by the recent surveillance activity noted.  The review of the submitted medical records do not support functional limitations or any reduction in the ability to work full time at a sedentary work capacity."  (AR 196-97, Doc. 25-2).

In a letter dated May 22, 2008, Sun Life advised Ray of its decision to discontinue long-term disability benefits.  Stating that she no longer qualified for those benefits, Sun Life referred specifically to Dr. Eaton's opinion reviewing her medical records, the surveillance, and a vocational assessment determining that her position, Vice-President of Manufacturing, is a sedentary occupation.  Sun Life paid Ray benefits through May 31, 2008.

On or about June 6, 2008, Ray appealed Sun Life's decision and submitted additional documents for review.  During the appeal process, Sun Life requested a non-examining opinion, based on Ray's medical records and surveillance video and report, from Dr. Michael Rosenberg, who is board-certified in internal medicine, cardiology, and interventional cardiology.  In Dr. Rosenberg's September 10, 2008 report, he stated that Ray's records demonstrate "left ventricular performance is normal, with generally normal left ventricular dimensions and an ejection fraction of greater than 55%."  (AR 115, Doc. 25-1, at 121).  Dr. Rosenberg also found that Ray's "[o]xygen saturations have recently been in the 95% to 99% range.  There is no evidence of desaturation with walking, and the patient does well on 6 minute walk test in the 1300 to 1600 foot range." (AR 116, Doc. 25-1, at 122).   Dr. Rosenberg also referenced Ray's activities documented in the surveillance videos, noting that Ray had "fluidity of movement, ability to walk for extended period of time with minimal sitting" and that she was able "to maintain a pleasant and unlabored demeanor during walking and carrying small packages."  (AR 117, Doc. 25-1, at 123).  He concluded that Ray "would represent a New York Heart Associational functional class I or II patient in the years 2005 and 2006 and onwards.  Objective data do not support a functional class III status at any time."  (AR 117, Doc. 25-1, at 123).  Disagreeing with the functional limitations listed in Ray's attending physician's statements, Rosenberg opined that she can "occasionally lift up to 20 lbs., frequently up to 10 lbs.  There is no limit to sitting; she can walk 5 hrs per day with rest periods, can stand for 2-3 hrs at a time.  Light and sedentary level work according to DOL classifications is acceptable."  (AR 118, Doc. 25-1, at 124).

On June 28, 2008, the Social Security Administration awarded Ray disability benefits

with an onset date of June 21, 2006.  Dr. Anderson, a heart specialist and consultant for the administration, had testified at the Social Security hearing that Ray's impairments equaled listing 4.02 for chronic heart failure and that she had equaled this listing since she had applied for disability.  On September 3, 2008, during the administrative appeal process, Ray's attorney submitted the Social Security Administration award letter to Sun Life for consideration.

On September 29, 2008, Dr. Bourge completed a questionnaire stating his opinion that Ray was disabled as defined by the Social Security Administration and that her disability was permanent.  He further stated: "[Ray] has symptoms with minimal activity (NYHA Class III) & limits her activities.  Stress causes ↑in HR (Afil) and ↑symptoms."  (Doc. 27-3, at 3).  In a letter dated October 13, 2008, Ray's attorney submitted this questionnaire to Sun Life.

In a letter dated October 20, 2008, Sun Life acknowledged the letters from Ray's attorney dated September 3, 2008 (enclosing notice of the Social Security Administration decision) and October 13, 2008 (enclosing Dr. Bourge's September 29, 2008 questionnaire).  Sun Life also included a copy of Dr. Rosenberg's report and the Claims Fiduciary language in the Certificate of Insurance explaining Sun Life's role.  This letter also advised Ray's attorney that the company would toll its final review of Ray's claim until November 25, 2008 to permit her an opportunity to respond.

After reviewing Ray's entire claim file, including the supplemental submissions provided on appeal and Dr. Rosenberg's opinion, Sun Life notified Ray in a letter dated December 29, 2008 of its decision to uphold the denial of further benefits.  Sun Life found that she "has the capacity to perform a sedentary to light occupation" and thus, is not totally disabled from her regular occupation, which falls within the sedentary to light demand.  (AR 108, Doc. 25-1, at

114).  Acknowledging that Ray submitted to Sun Life a favorable Social Security decision, Sun

Life advised Ray that Social Security determinations do not guarantee eligibility for long-term

disability benefits under the Sun Life policy; that the Social Security Administration may not

have had all of the information that Sun Life reviewed in making its decision; and that the

eligibility under Sun Life's policy is based on the specific terms of that policy.  Sun Life noted

that the onset date of the successful claim for disability was June 21, 2006 and that the Social

Security Administration had earlier denied Ray's disability claim with an onset date of

September 6, 2005 - the same onset date as the one made the basis of this suit.

In letter dated February 5, 2009, Ray's counsel confirmed that he had provided the

following information to Sun Life:  favorable award of disability benefits from the Social

Security Administration dated June 28, 2008; notice of that award dated July 29, 2008; and a

letter from attorney explaining the basis of the amended onset date of disability.   In a letter dated

February 9, 2009, Sun Life informed Ray's attorney that it would not reverse its decision to close

Ray's claim and that her disability benefits would remain terminated.

Sun Life's counterclaim alleges that the company is entitled to reimbursement from Ray

of "overpayments."  Ray's policy includes the following provisions relevant to that claim:

> **Reimbursement**
> We have the right to recover from you any and all overpayments due
> to:
>  . . .
> 3.  Your receipt of Other Income.
>
> **Other Income**
> Other Income means those benefits or amounts you receive or are
> eligible to receive as indicated below:
> . . .
> 5.  Any amount of disability or retirement benefits under:

a)the United States Social Security Act to which;
i) you are entitled . . . .

**Application of Other Income**
If you . . . become eligible for any Other Income, you. . .must:
1.  Apply for such Other Income; and . . .
...
Until approval or denial is made we will, at your option, make payments under
either Method A or B below:
. . .
Method B: Subject to your written agreement, we will pay your Monthly
Benefit with no reduction for estimated Other Income until any Other Income
payor reaches a decision.  When a decision is reached, you must send us a
copy of such decision and reimburse us in full for any overpayment we have
made as a result of that decision. . . .

(Doc. 25, Ex. A-2, at 14-15, & 27).  Consistent with these provisions, Ray signed a

Reimbursement Agreement dated October 25, 2005 stating in part:

I understand that the disability benefits payable to me under the LTD plan . . .
are subject to reduction by certain "Other Income" as defined in the certificate
and policy.  This "Other Income" may include Social Security . . . payments. .
. . .In consideration of [Sun Life] making full benefit payments to me without
such an estimate [of Other Income], I understand and agree to the following:
. . .
4.  I agree to repay [Sun Life] immediately in a lump sum all benefits that may
have been overpaid, regardless of whether or not my coverage under this
policy is in force on the date of any such payment.
5.  I understand that if a lump sum payment is not made by me, [Sun Life] will
have the right to withhold my benefits until full reimbursement of the
overpayment is received.

(AR 100, Doc. 25 )

Ray's receipt of Social Security benefits resulted in an overpayment for the time Sun Life

paid long-term disability benefits.  Sun Life notified Ray of the overpayment and its position that

Ray owed Sun Life reimbursement.

21

## C.  STANDARD OF REVIEW

ERISA does not provide a standard of reviewing decisions of plan fiduciaries or administrators. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).  "[T]o fill this void, the Supreme Court of the United States held in *Firestone* that district courts should review de novo benefit decisions made by an administrator who is without discretion to determine eligibility or construe the terms of an ERISA-governed plan." *Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352, 1355-56 (11th Cir. 2008) (citing *Firestone*, 489 U.S. at 115).

Prior to the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008), the Eleventh Circuit recognized the following steps of analysis in an ERISA case:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision is '*de novo* wrong,' then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is '*de novo* wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, the apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*White v. Coca-Cola Co.*, 542 F.3d 848, 853-54 (11th Cir. 2008) (citing *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004)). The Eleventh Circuit

recognized that the Supreme Court in *Glenn*[3] implicitly overruled that framework, but only "to the extent that it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard." *Doyle*, 542 F.3d at 1360.  After *Glenn*, steps one through five remain, and only step six is modified; if a conflict exists, the court now treats it as one factor in determining whether the administrator's benefits decision was arbitrary and capricious.  *See Capone v. Aetna Life Ins. Co*., 592 F.3d 1189, 1196 (11th Cir. 2010) (stating "we agree that the *Williams* methodology remains intact except for the sixth step").  "[T]he burden remains on plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."*Id.* at 1360.

### D.  DISCUSSION

Sun Life initially approved Ray's application for long-term disability benefits.  After continuing evaluations of updated medical information, Sun Life made a determination that she no longer qualified for those benefits, and thus, discontinued benefits as of May 31, 2008.  The instant suit represents an appeal of that decision after appeals at the administrative level.

1.  Step One - Whether the Claim Administrator was *De Novo* Wrong

Under the first step, the court conducts a *de novo* review of the ERISA benefits denial.  Because the court has already determined that Sun Life has discretion under the plan, it bases its review on the administrative Record that was available to the plan administrator at the time the decision was made.  *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246-47 (11th

---

[3]In *Glenn*, the Supreme Court found that instead of invoking a heightened standard, the existence of a conflict of interest should be *one factor* that the reviewing court should take into account when determining whether the decisionmaker abused his discretion.  The importance given that factor would depend upon the circumstances of the case and the likelihood that the conflict affected the benefits decision.  128 S. Ct. at 2350-51.

Cir. 2008) (stating, in a case where the claims administrator had discretion under the plan, that when evaluating whether the claims administrator's decision was wrong, "[w]e are limited to the record that was before [the claims administrator] when it made its decision."); *Scippio v. Fla. Combined Life Ins. Co.*, 585 F. Supp. 2d 1317, 1328 (N.D. Fla. 2008) (citing *Glazer* and stating that "[i]f the administrator had discretion, the Court may only consider the evidence the administrator was aware of at the time [of] the decision when determining whether the decision was *de novo* wrong.").

This court must determine first whether Sun Life's decision was *de novo* wrong.  "A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, 'the court disagrees with the administrator's decision.'" *Glazer*, 524 F.3d at 1246 (quoting *Williams*, 373 F.3d at 1138 & n.8).  For the following reasons, the court finds that Sun Life's decision was not wrong.

The ERISA plan at issue provides the following definition of total disability: "You will be considered Totally Disabled if you are unable to perform all the material and substantial duties of your regular occupation."  (AR 106, Doc. 25-1, at 112).  Ray asserts that the Record establishes her inability to perform the duties of her regular occupation through the numerous opinions of Dr. Bourge, her treating physician; and through the Social Security Administration's award of disability.  Further, Ray argues that Sun Life's conflict of interest tainted its decision.

   *a.  Dr. Bourge's Opinions*

Ray argues that the medical records and opinions of Ray's treating physician, Dr. Bourge, establish her disabled status, and indeed, Dr. Bourge's opinions, if reliable, provide the strongest support for her claim of disability.  The Record contains numerous documents from Dr. Bourge

that characterize her cardiac condition as class 3 (marked limitation) or class 4 (complete

limitation).  The Record also contains Dr. Bourge's opinion that Ray has been permanently

disabled from work since November 2005.  Sun Life argues, on the other hand, that other

documents in the Record contradict Dr. Bourge's opinion regarding the severity of Ray's

condition, and his own records provide opinions that are inconsistent with each other and with

his ultimate conclusion that Ray is permanently disabled from her cardiac condition.

*1. Internal Inconsistency*

The court first examines Dr. Bourge's own statements and medical records.  Ray

characterizes Dr. Bourge's statements as *consistently* supporting Ray's disabled status in his

briefs supporting his own motion.  *See* Doc. 28, at 9: "As many times as asked, Dr. Bourge has

confirmed total disability. . . ."; Doc. 41, at 4: "Dr. Bourge has consistently stated that Ms. Ray is

totally disabled. . . ."  However, Ray acknowledges in his response to Sun Life's motion that Dr.

Bourge's February 1, 2006 record "is inconsistent" with Dr. Bourge's other opinions.  (Doc. 37,

at 17).  In fact, the inconsistencies are not limited to one document, as reflected below.

| Date of Record/Statement | Classification of Condition | Type of Document |
|---|---|---|
| 2005 | Class 4 (complete limitation) | statement to Sun Life |
| 2/2006 | Class 1 [no symptoms/limitations in ordinary physical activity]; Records Ray's denial of cardiac symptoms - dypsnea, orthopnea, PND, edema, chest pain, syncope | office notes |
| 5/4/2006 | Class 3 (marked limitations) Class 1 box marked & marked out | statement to Sun Life |
| 5/5/2006 | "improved to Class II [mild symptoms]" Records Ray's denial of cardiac symptoms - | office notes |

25

"denies any chest pain, shortness of breath,
increased dyspnea, orthopnea, PND, edema,
dizziness, or syncope."

| 8/2/2006 | "still remains . . . Class III"<br>Records Ray's denial of cardiac symptoms | office notes |
|---|---|---|
| 11/16/2006 | Class 3 | statement to Sun Life |
| 6/13/2007 | Class 2<br>Records Ray's denial of cardiac symptoms<br>except elevated heart rate - "no shortness of<br>breath at rest or with [activities of daily life]<br>. . . quite active around her house . . . denies<br>chest pain, lower extremity edema, dizziness,<br>or PND" | office notes |
| 7/8/2007 | Class 3<br>"symptoms present with only a small<br>amount of exertion are shortness of breath,<br>extreme fatigue, chest pain, dizziness, panic" | statement to Sun Life |
| 9/5/2007 | "Class II-III, stable"<br>"performs her activities of daily living<br>without any problems. . .denies heart failure<br>symptoms." | office note |
| 1/30/2008 | Stable Class IIb-III<br>"She states her symptoms have been stable<br>with her baseline shortness of breath and dyspnea<br>on exertion along with two-pillow orthopnea.<br>She denies chest palpitations, worsening edema,<br>dizziness, or syncope." | |
| 9/29/2008 | Class 3<br>Symptoms with minimal activity | statement to Sun Life |

Thus, Dr. Bourge provides constantly changing NYHA classifications of Ray's condition.

The only consistency is in the statements to Sun Life, which state at least marked heart failure

symptoms even when the most recent office visits record Ray's repeated denials of heart failure

26

symptoms.  Although the court acknowledges that a certain amount of fluidity may exist in a

patient's condition, such fluidity should manifest itself in the office notes.  Given that the office

notes generally reflect Ray's *denial* of heart failure symptoms, the court cannot reconcile them

with Dr. Bourge's characterization of her heart failure as Class 3 and assertion that she

experiences symptoms with minimal activity.  *See, e.g*, 5/4/2005 & 7/8/2007 statements.  Ray

dismisses the inconsistency as limited to a single incorrect entry, but such a dismissal is

disingenuous; as reflected in the summary above, the inconsistencies permeate Dr. Bourge's

medical records and letters.

        Accordingly, the court agrees that Dr. Bourge's documents are internally inconsistent and

finds that the inconsistencies between his medical records and his opinions call into question the

reliability of those opinions.  Dr. Bourge's status as Ray's treating physician does not require that

the court automatically give special weight to his conclusions.  *See Black & Decker Disability

Plan v. Nord*, 538 U.S. 822, 834 (2003).  In any event, the inconsistencies provide a good reason

for refusing to do so in this case.  *See, e.g., Davis v. Unum Life Ins.* Co., 444 F.3d 567, 578 (7th

Cir. 2006)*, cert. den.,* 549 U.S. 884 (2006) (finding that the doctor was "more of an advocate

than a doctor rendering objective opinions" when he opined that claimant was limited by

coronary artery disease even though doctor's own records listed no cardiac limitations after

successful angioplasty).

        *2.  Inconsistency with other Doctors' Opinions*

    Dr. Bourge's opinions are inconsistent not only with his own medical records, but also

with opinions of Doctors Eaton and Rosenberg.

    Dr. Eaton is an independent consultant who is board certified in internal medicine with a

subspecialty in cardiovascular disease, and thus, has credentials comparable to those of Dr. Bourge.  Dr. Eaton reviewed Ray's medical records from Kirklin Clinic and Cardiology Clinic, and surveillance information, and gave Sun Life a Peer Review Report.  In that report, contrary to Dr. Bourge's opinion, he found that Ray was capable of returning to her own occupation.  He found no restrictions or limitations that would preclude Ray from performing sedentary work based on the physical findings and the lack of symptoms associated with heart failure.  Dr. Eaton provided a reasonable basis for his opinion:  Ray's medical records, including Dr. Bourge's office notes reflecting that Ray denied heart failure symptoms and was performing her activities of daily living without any problems; and Ray's activities under surveillance.

Although Ray criticizes Dr. Eaton's report, her attempts to discredit it are not successful. Admittedly, Dr. Eaton did not physically examine Ray; however, as noted previously, the law does not require courts deciding ERISA cases to give special weight to treating physicians and automatically reject the opinions of reviewing physicians who disagree with them.  *See Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1287 (11th Cir. 2003) (quoting *Nord*, 538 U.S. at 834, and finding the district court erred in giving special weight to the treating physician's evaluation over that of the reviewing physician).  Contrary to Ray's argument, in the case of *Oliver v. Coca-Cola*, 497 F.3d 1181 (11th Cir. 2007), the Eleventh Circuit does not accord such special weight to a treating doctor's opinion.  In that case, the Court of Appeals found that the plan administrator arbitrarily *ignored* relevant and reliable medical evidence – the treating physician's diagnosis of fibromyalgia and chronic pain syndrome – in denying plaintiff's claim for ERISA benefits.  However, the Court reaffirmed the *Shaw* decision and the practice of rejecting a treating physician opinion as well as denying benefits *on the basis of conflicting, reliable*

28

*evidence, even when that evidence was an opinion of a reviewing physician.*  The Eleventh

Circuit distinguished *Oliver* from *Shaw* by explaining that the conflicting reviewing doctor's

decision in *Oliver* was flawed and not reliable.  *Oliver*, 497 F.3d at 1197-99.

Further, Ray claims that Dr. Eaton never reviewed Ray's job description, but the doctor's

opinion repeatedly refers to the title of her position and its sedentary nature, which Ray does not

dispute.  The court finds that Dr. Eaton's opinion represents reliable evidence that contradicts Dr.

Bourge's opinion and supports Sun Life's denial of disability benefits.

Dr. Rosenberg, a second independent medical reviewer who is board certified in internal

medicine, cardiology, and interventional cardiology, also found that Ray is capable of returning

to work at her own occupation and supports Sun Life's denial of disability benefits.  Noting

Ray's ventricular performance and dimensions and oxygen saturation levels, including levels

during walking tests, as well as her fluid and unlabored performance of activities in surveillance

videos, Dr. Rosenberg specifically disagreed with Dr. Bourge's categorization of Ray as a Class

III heart patient and his determinations of her functional limitations.  Dr. Rosenberg found

instead that Ray is capable of work at the light and sedentary level and that she fit within

functional Class I or II from 2005 and 2006 onward but never within Class III.  Ray does not

attempt to discredit Dr. Rosenberg's opinion, and this court finds that it, too, is reliable support

for Sun Life's termination of disability benefits.

### 3.  Other Doctors' Opinions: Carr and Anderson, Kay

The court notes that none of the other physicians who proffered opinions about Ray's

ability to work had access to all of the documents that Doctors Eaton and Rosenberg did.  Dr.

Carr reviewed Ray's medical file and found in March of 2006 that Ray had a level of impairment

that precluded her working as of that date.  However, Dr. Carr acknowledged the recent

documented improvement in Ray's condition and stated that his finding was based upon the

uncertainty about whether her cardiac condition had stabilized at the improved level.  He

expressly recommended follow-up with subsequent office notes to determine whether her

condition had indeed stabilized.  Because the subsequent office notes and other documents Sun

Life relied upon reflect stabilization at the improved level, Dr. Carr's opinion in March 2006

does not provide reliable support for a finding of disability after May 31, 2008.

 Ray also argues that Dr. Anderson, a heart specialist and consultant for the Social

Security Administration, testified at Ray's Social Security hearing and concurred with Dr.

Bourge regarding the severity of Ray's cardiac condition.  However, the statement of facts and

the list of evidentiary documents proffered in this case do not indicate that Dr. Anderson's report

or the transcript of Dr. Anderson's testimony is included in the administrative Record or that the

Record otherwise reflects the documents upon which Dr. Anderson based his opinion.  Without

such information, the court cannot determine whether Dr. Anderson's opinion provides reliable

support for a finding of disability after May 31, 2008.

 The only other doctor record of which this court is aware is an office note when Ray saw

Dr. Neal Kay at Kirklin Clinic in October of 2006.  In this note, Dr. Kay stated that Ray was

doing well and called for her to return in a year for a routine follow-up.  Therefore, none of the

records or statements of other doctors provide reliable evidence in support of a finding of

disability after May 31, 2008.

 The court should not and does not accord special weight to the opinions of Dr. Bourge as

a treating physician.   Because Dr. Bourge's opinions are internally inconsistent, contradict other

doctors' reports that constitute reliable evidence, and are not supported by other reliable medical evidence, the court finds that his opinions do not constitute reliable evidence, and, therefore, rejects them.  The court finds the opinions of Dr. Eaton and Dr. Rosenberg to be consistent with medical records, surveillance information and each other, and thus, constitute more reliable evidence.

   b. *Social Security Administration's Determination of Disability*

   Ray also argues that the Social Security's determination that Ray is disabled would support a similar determination in the instant case.  The court acknowledges that the ruling of the Social Security Administration is relevant.  Indeed, Sun Life acknowledged the ruling in the decision terminating Ray's disability benefits and explained the reasons for its termination despite that ruling.  However, that decision is not dispositive for several reasons.  One reason is that the record of the Social Security case could be and presumably was different from the Record of the instant case.  Neither Sun Life nor this court had or has access to the record in the Social Security case, and thus, neither Sun Life nor this court knew or knows the exact information upon which the Administration based its decision.  But, at the very least, the Social Security case's record would not contain the surveillance information and the medical opinions of Dr. Eaton (Peer Review) and Dr. Rosenberg, all part of the Record here and *material* to Sun Life's decision terminating benefits.

   Further, different rules apply in ERISA and Social Security cases.  For example, although the instant discussion is conducted pursuant to a step one *de novo* review, ultimately the court would award deference to Sun Life's decision because of the discretionary authority provided to Sun Life in plan documents.  *See Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1452 n. 5

(11th Cir. 1997) (noting that although a court may consider the Social Security Administration's decision regarding disability, that decision is not dispositive of an ERISA disability determination "particularly given the measure of deference that we afford a plan administrator's decision"). As another example, the ALJ in a Social Security case must give substantial weight to the opinion of a treating physician unless he articulates good cause for rejecting it, *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004), a deference not required in ERISA cases.

In the instant case, Sun Life and this court both considered the disability determination of the Social Security Administration. However, this court does not consider the Social Security Administration's finding dispositive of its disability determination and does not find Sun Life's decision *de novo* wrong simply because it is contrary to the Administration's finding.

Having considered the primary evidence that Ray offers in support of her disability – Dr. Bourge's opinions and the Social Security Administration's determination – the court finds that Ray has not proven through that evidence alone that Sun Life's decision was *de novo* wrong; therefore, the court will proceed to consider the other evidence of Record.

*c. Surveillance*

The court has reviewed the surveillance report and related DVD/video, which provide some objective evidence upon which Sun Life relied to terminate disability benefits. On March 29, 2008, the investigator documented Ray's activities over a seven-and-a-half-hour period away from home, during which period she and her family went to a restaurant, an AT&T store, a convenience store, a department store, a clothing store, a bake shop, and to an area of several car dealerships. There, they spent two hours car shopping: the DVD records Ray and family members standing, walking around and looking at four different makes of cars, and taking a test

32

drive.  At one point during the two hours, Ray and her family sat under a tent with a salesman, but this action appeared to be connected with sales negotiations and the test drive.  The surveillance video shows Ray walking and entering vehicles fluidly, without assistance, and without apparent effort and, at times, carrying bags without apparent effort.  A month later, on April 29, 2008, the investigator documented Ray driving to three different locations during the course of the day: a school, a bank, and an attorney's office.  At the attorney's office, she entered and exited the car and walked to the office fluidly, without assistance and without apparent effort.  In at least one of Ray's driving trips, she was behind the wheel for more than 19 continuous minutes when the investigator lost sight of her car.

The surveillance report and footage provide objective evidence contradicting Ray's claimed physical limitations.  On Dr. Bourge's Attending Physician's Supplemental Statement dated in August of 2007, he stated that the most Ray could stand or walk at a time was a quarter of an hour, but the March of 2008 surveillance shows her car shopping over a two-hour period, and although she spent a portion of that time taking a test drive and sitting with the salesman under a tent, she spent more than a quarter of an hour at a time on her feet.  That day's surveillance of a 7-hour shopping trip around town with fluid movements and no visible signs of effort, fatigue, or pain also contradicts the representations of both Ray and Dr. Bourge that she experienced cardiac symptoms, such as shortness of breath, extreme fatigue, and chest pain, with only limited activity.  Similarly, Ray claimed that she only drove for short period of time within her immediate neighborhood, but the surveillance in April of 2008 reflected differently.

Obviously, the surveillance evidence also calls into question the credibility of Ray and Dr. Bourge in a general sense and the ability to rely on their assessments of her condition as

33

candid.  Given the opinions of independent medical examiners that disagree with Dr. Bourge and

Ray about the severity of her cardiac condition and its effect on her ability to work as well as the

conflicting statements about Ray's cardiac symptoms in Dr. Bourge's own office notes, the

credibility issue is key.

Ray cites two cases in which the reviewing court criticizes the plan administrator's

inappropriate reliance on surveillance: *Cross v. Metro. Life Ins. Co.*, 292 Fed. Appx. 888 (11th

Cir. 2008); and *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623 (9th Cir. 2009).  The

court notes that neither represents controlling authority, as *Cross* is an unpublished opinion[4] and

*Montour* hails from the Ninth Circuit.  In any event, the court finds that both involve facts

distinguishing them from the instant case.

In *Cross,* the Eleventh Circuit questioned whether the surveillance provided more than an

inaccurate "snapshot" of the plaintiff's activities throughout the five days of observation, because

the five days of surveillance resulted in only two hours of video that did not show the plaintiff

exerting himself "and did nothing to disprove [his] reports of pain."  292 Fed. Appx. at 892.

Because that plaintiff's job position required at least a light-strength demand with certain

specified movements at specified weight minimums, footage without exertion was not

particularly material or determinative, particularly when his doctor's reports indicated that he

"simultaneously stepped-up his dosages of pain medication" even during the non-exertional

activities observed.  *Id.* At 892-93.  In contrast, the video footage in the instant case *did*

contradict the representations about Ray's physical limitations and was very material.  Further,

---

[4]Unpublished opinions "are not controlling authority and are persuasive only insofar as
their legal analysis warrants."  *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n. 7
(11th Cir. 2007).

the Eleventh Circuit's fault-finding was not limited to the defendant's use of surveillance; it focused heavily on the defendant's failure to obtain a functional capacities evaluation that the independent medical examiners specifically recommended, a recommendation not present in the instant case.

In *Montour,* the Ninth Circuit addressed the issue of surveillance in the context of whether the conflict of interest tainted the decision-making-process, an issue this court does not reach. However, the observed activity in that case was "brief and consistent with Plaintiff's self-reported limitation," which is not true in the instant case. *See Montour*, 588 F.3d at 633.

In sum, the court finds that the surveillance evidence in the instant case is material and finds that Sun Life was entitled to rely on it in assessing the credibility of Ray's subjective statements about her cardiac symptoms and that of the various medical opinions regarding Ray's cardiac limitations. *See Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002) (summarizing the observations in the surveillance report and stating that the plan was "entitled to rely on the opinion of the independent medical examiner . . . in light of the surveillance report."); *Schindler v. Metro. Life Ins. Co.*, 141 F. Supp. 2d 1073, 1081 (M.D. Fla. 2001). The court notes that the surveillance evidence in the instant case is not the *only* evidence in the administrative Record that supports Ray's ability to work; the Record also contains numerous medical office notes recording Ray's own denial of cardiac symptoms, as well as the independent medical reviews of Dr. Eaton and Dr. Rosenberg determining that Ray was capable of returning to work at her own occupation.

d. *"Regular Occupation"*

Ray also claims that Sun Life erred in finding that she was no longer disabled because it

failed to take into account that her own job, although sedentary in nature, is stressful and requires travel and 24-hour availability.  However, Sun Life argues that the policy in question insures against disability from performing an employee's "own occupation," and that Ray is confusing the term "own occupation" with "own job."  As Sun Life's argument goes, Sun Life and the court should determine whether Ray is disabled from performing the occupation of vice president of manufacturing as it is generally performed "for an employer in the national economy," without reference to the specific duties that Ray performed in this particular job. *(See* Sun Life's letter terminating benefits with quoted language, AR 198 Doc. 25-2, at 54).

Ray's policy provides "You will be considered Totally Disabled if you are unable to perform all the material and substantial duties of your regular occupation."  The policy does not define the term "regular occupation" nor does it *expressly* modify the term as including only those duties required for the occupation as performed for any employer in the national economy.  Accordingly, the court must look outside the policy to define "regular occupation."

Neither the United States Supreme Court nor the Eleventh Circuit has squarely addressed the proper application of this definition where the policy or plan provides no definition or guidance.  *See Tippett v. Reliance Standard Life Ins. Co.,* 457 F.3d 1227, 1234 (11th Cir. 2006) (finding that the district court did not err by defining "regular occupation" through use of the national DOT job description, where district court actually addressed both the DOT national standard *and* the standard based on employee's job description and decided that employee was ineligible for benefits under *either* standard).  However, to the extent that Sun Life's brief implies a consensus exists to treat that term as referring to categories of work on the national level rather than a claimant's individual job duties, that implication is incorrect.  *Compare* cases

interpreting "regular occupation" to mean a position of the same general character as opposed to

a particular job for a particular employer: *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 454

& n. 8 (5th Cir. 2007) (finding that plaintiff's "regular occupation" was that of an attorney with

duties as they are found in the general economy, "not restricted to his own specific job as a

litigation attorney with a uniquely stressful practice"); *Gallagher v. Reliance Standard Life Ins.*

*Co.*, 305 F.3d 264, 272 (4th Cir. 2002) (addressing the "regular occupation" term and – in an

opinion the Eleventh Circuit disagreed with on other grounds in *Tippitt v. Reliance Standard Life*

*Ins. Co.*, 457 F3d 1227, 1237 (11th Cir. 2006) –  adopting the objectively reasonable standard

and the DOT job description of the occupation); *Tsoulas v. Liberty Life Assurance Co. of Boston,*

397 F. Supp. 2d 79, 96 n. 17 (D. Me. 2005) ("When the term 'occupation' is undefined, courts

properly defer to the DOT definition of the term because insurers issuing disability policies

'cannot be expected to anticipate every assignment an employer might place upon an employee

outside the usual requirements of his or her occupation'"); *Hamall-Desai v. Furtis Benefits Ins.*

*Co.*, 370 F. Supp. 2d 1283, 1307-08 (N.D. Ga. 2004) ( stating that "the Plan's disability

definition requires the [Plaintiff] not be able to perform one of the material duties of her *regular*

occupation.  It does no require that she be unable to perform one of the material duties of her

occupation as altered by her employer); *with,* on the other hand, cases interpreting that term to

mean the employee's particular job duties:  *Lasser v. Reliance Standard Life Ins.* Co., 344 F.3d

381, 386 (3rd Cir. 2003) (stating "it is unreasonable for Reliance to define 'regular occupation'

[broadly] . . . without explicitly including that different definition in the Policy."); *Shahpazian v.*

*Relianc*e *Standard Life Ins. Co.*, 388 F. Supp. 2d 1368, 1379 (N.D. Ga. 2005) (finding that where

the policy did not expressly define "regular occupation," the claims administrator erred in using

the definition of the occupation as it is normally performed in the national economy);  *Freling v. Reliance Standard Life Ins. Co.*, 315 F. Supp. 2d 1277, 1287-88 (S.D. Fla. 2004) (rejecting use of the DOT's national occupational definitions to define "regular occupation").

Given the lack of consensus and the lack of controlling authority addressing this issue, this court is not prepared to say Sun Life was wrong in defining the term by the national standard; however, the court notes that Sun Life could avoid this issue in the future simply by defining the term in the policy.  In researching the term "regular occupation," the court found cases examining policies that do expressly define the term by a national standard, but Sun Life chose not to include such a definition in the policy in question.

Using the national standard, the court finds that Sun Life was not "wrong" in determining that she was able to perform her regular occupation of vice-president of manufacturing, a sedentary job.  Dr. Eaton, an independent medical reviewer, noted Ray's repeated denial of cardiac symptoms in doctor office notes and her activities during surveillance and specifically found that she could work full-time at her own occupation and at sedentary jobs.  A second independent medical reviewer, who was board-certified in cardiology, agreed that Ray was not disabled from her own occupation and from sedentary jobs after looking at ventricular performance and walk tests.  Although the court acknowledges that these doctors' conclusions differ from that of Ray, the Social Security Administration, Dr. Bourge, and the preliminary report of Dr. Carr, the court has already explained why it finds the IME opinions to be more reliable.  In addition, the court relies on the information contained in the surveillance reports and video, which contradicts claims of disabling symptoms.

However, assuming *arguendo* that the "own job" standard applied instead, the court finds

38

that Ray would not be disabled from returning to work at her own particular job with

accompanying job duties.  Ray does not dispute the sedentary nature of her job, but argues that

the disability determination must also take into account her own job's 24-hour availability

requirement, travel duties, and accompanying stress.  Although the job description does refer to

24-hour availability and travel requirements, the facts presented do not include any specific

information regarding how often, if at all, Ray was actually called to deal with work-related

matters after hours, nor does it include specific information regarding how often or how far she

was required to travel.  Having failed to provide specific information on these matters, Ray has

not proven that these requirements as practiced converted her sedentary occupation into one for

which she is disabled.  The surveillance information indicates that she is indeed capable of

driving and traveling to some extent.  Contrary to her own representations, she can drive outside

her immediate neighborhood and can endure a seven hour trip away from home, eating out and

shopping.  Further, her job description indicates that her employer is amenable to making

reasonable accommodations to enable her to work.

As to the stress of Ray's job, Ray and Dr. Bourge stated that the stress rendered her job

disabling, but the court has already noted the problems with the reliability of their opinions. The

facts reflect that Ray's cardiac problems were stable and asymptomatic, and without more

specific and reliable support for her claims, Ray has not proven that the alleged stress converted

her sedentary job into one that she was disabled from performing. If having stable and

asymptomatic cardiac conditions means that employees are automatically disabled from

performing any stressful sedentary jobs, the court suspects that most of the attorneys over 50

years old in this district would be entitled to receive disability benefits.  The Seventh Circuit has

rejected similar claims of disability based on allegations of the deleterious effect of high stress

jobs on employees with controlled, asymptomatic cardiac conditions. *See Leipzig v. AIG Life*

*Ins.* Co., 362 F.3d 406, 409 (7th Cir. 2004) (affirming the benefits denial for "chief dealer" at the

Chicago Mercantile Exchange with coronary artery disease when it rejected the opinions of

several physicians and adopted the position of one who concluded that plaintiff could return to

his high stress job)[5]; *Black v. Long Term Disability Ins.*, 482 F.3d 738, 746-47 (7th Cir. 2009)

(finding that denial of long term disability benefits of plan participant diagnosed with multiple

aortic aneurysms was not arbitrary and capricious where records reflected her blood pressure was

under control and treating physicians' statement about her inability to perform her stressful job

were internally inconsistent, shifting to support her disability claim).

In any case, Ray has not proven that she is disabled from performing her own occupation

based on *either* standard: the national standard or the one reflected in her own job description.

Accordingly, the court finds that Sun Life's decision terminating her benefits was not *de novo*

wrong.  In light of that finding, the court need not proceed with the other steps of analysis that

the Eleventh Circuit has espoused in an ERISA case; it will AFFIRM the decision.  Thus, Ray's

motion for judgment on the pleadings is due to be DENIED; and Sun Life's cross motion, which

this court deems through express agreement of the parties to be a motion for judgment on the

merits, is due to be GRANTED as to both counts of the Complaint.  The court will address Sun

Life's counterclaim below.

---

[5] The court noted that "[m]any persons with serious heart conditions work at stressful jobs for years without ill effects" and stated that "physicians accept at face value what patients tell them about their symptoms[,] but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits." *Leipzig*, 362 F.3d at 409.

Alternatively, the court finds that to the extent, if any, that Sun Life's decision terminating Ray's benefits was *de novo* wrong, Sun Life did not abuse its discretion and its decision was not arbitrary and capricious, but rather, was a reasonable decision supported by evidence in the Record.  Given the lack of consensus and lack of controlling authority providing guidance on the issue of which standard to use in applying the term "regular occupation," Sun Life's decision to use the national standard was a reasonable one.  In any event, under *either* standard, Sun Life's decision that Ray was able to return to her regular occupation was reasonable.  Given the internal inconsistencies in Dr. Bourge's records and the inconsistency between his opinions and those of the independent medical examiners as well as the surveillance information, its decision to reject Dr. Bourge's opinions was reasonable.  The opinions of those medical examiners were not weak or ill-reasoned, but rather, were supported by references to the medical records, medical tests, and surveillance information.  Further, given the irreconcilable inconsistencies between the surveillance information and Ray's representations of her condition, the decision that her representations were not reliable was reasonable. Although the Social Security Administration may have reasonably concluded based on the information before it that Ray is disabled, the Record and the rules on deference differ in the instant case, and the differing conclusion of the Social Security Administration does not mean that Sun Life's decision was unreasonable.  The court has considered Sun Life's conflict of interest as an additional factor, but many other factors previously discussed – including but not limited to the use of two independent medical examiners who are cardiac specialists, the surveillance information, and all the inconsistencies that marred Dr. Bourge's opinions – cause this court to conclude that the conflict did not cause Sun Life to abuse its discretion.  Thus, as an alternative ruling, the court finds that

41

even if the decision were *de novo* wrong, a reasonable basis for the decision nevertheless exists, and it is due to be affirmed on that basis.

### E.  Sun Life's Counterclaim

In its counterclaim against Ray, Sun Life claims entitlement to recover overpayments that resulted when Ray received Social Security benefits retroactive to December 2006 overlapping with Sun Life's payment of disability payments through May 31, 2008.  Ray's policy with Sun Life provided that it was entitled to offset "Other Income" Ray received, and its definition of that term included any payment of Social Security disability benefits.  Ray does not dispute that she received the Social Security payments for that period of time.  She does not dispute that she failed to reimburse Sun Life for those payments.  However, she denies her obligation to repay Sun Life, and claims that Sun Life's counterclaim is not authorized by Section 502(a)(3) of ERISA.

Section 502(a)(3) of ERISA authorizes a fiduciary to file an action "to obtain . . . appropriate *equitable* relief . . . to enforce . . . the terms of the plan." (emphasis added).  The parties acknowledge that the counterclaim is brought to enforce the terms of the plan, and specifically, the right to offset "Other Income."  The issue here is whether Sun Life's counterclaim requests equitable relief.  Sun Life says it does.  Predictably, Ray says it does not, but argues instead that it is an improper claim at law disguised as an equitable claim.

The Supreme Court of the United States has decided several ERISA cases that provide guidance on this issue.  In *Martens v. Hewitt Assoc.,* 508 U.S. 248 (1993), the Supreme Court explained that § 502(a)(3)(B) authorized "those categories of relief that were *typically* available in equity," and conversely, did not support claims at law for "compensatory *damages." Id.* at 256.

Two other cases addressed claims for restitution involving provisions in ERISA plans similar to the "Other Income" provision at bar.  In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Court found that the request was not for typical equitable relief because the funds requested were *not in the other party's possession* but had been placed in trust; thus, the Court found that the restitution sought was not equitable and the section did not authorize it.

By contrast, in *Sereboff v. Mid Atlantic Medical Servs., Inc.*, 547 U.S. 356 (2006), the Court found that the fiduciary could maintain an action against plan beneficiaries seeking reimbursement for settlement proceeds a third party tortfeasor paid them for medical expenses. Noting that "one feature of equitable restitution was it sought to impose a constructive trust or equitable lien on particular funds or property in the defendant's possession," the Court acknowledged that the Sereboffs' plan reserved a first lien upon any recovery that the beneficiary received from a third party.  Thus, the suit before the Supreme Court coincided with the features of equitable restitution: the fiduciary's suit asked for recovery pursuant to the equitable lien and not from the Sereboffs' assets generally but from "specifically identifiable funds that were within the possession and control of the Sereboffs - that portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and preserved [in the Sereboffs'] investment accounts."  *Id.* at 363 (internal quotes omitted).

In the instant case, the court does not have enough information to know whether the funds in the instant case meet the features of equitable restitution as explained in *Sereboff.*  For example, even assuming that the terms of the plan and reimbursement agreement establish an equitable lien, the court does not know whether the recovery sought is from Ray's assets generally or from an identifiable fund or from a fund not in Ray's possession.  Accordingly, the court finds that relief

43

sought under the counterclaim is due to be DENIED without prejudice.

## V.  CONCLUSION

In sum, for the reasons stated above, the court finds as follows:

- Plaintiff's Motion to Strike (Doc. 36) is due to be DENIED;

- Plaintiff's Motion for Partial Summary Judgment (Doc. 21): The motion is MOOT as withdrawn as to all issues except whether the plan documents include a valid grant of discretionary authority to Sun Life; the ERISA plan at issue expressly confers discretionary authority to the Defendant, now known as Sun Life, and thus, the motion is due to be DENIED on the remaining issue;

- Plaintiff's Motion to Supplement the Record and alternative Motion to Remand (Doc. 20) are both due to be DENIED; and

- Plaintiff's Motion for Partial Judgment on the Record is due to be DENIED and alternative Motion for Summary Judgment is due to be DENIED (Doc. 27);

- Defendant's Motion for Summary Judgment (Doc. 23), which the parties agreed to be a submission for a decision on the merits, is due to be GRANTED as to the counts set forth in the Complaint and due to be DENIED without prejudice as to the Counterclaim. The court will enter a separate Order consistent with this opinion.

Dated this 29th day of September, 2010.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE